RECEIVED

JAN 2 7 2009

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA



UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

ELLEN CARLE

VERSUS

MARITIME HOUSING, INC., d/b/a
LIVING QUARTER TECHNOLOGY

CIVIL ACTION NO.: 07-892

JUDGE DOHERTY

MAGISTRATE JUDGE HILL

## MEMORANDUM RULING

Currently pending before the Court is a Motion for Partial Summary Judgement, filed on

behalf of defendant, Maritime Housing Inc. d/b/a Living Quarter Technology ("LQT"). [Rec. Doc.

11] In the motion, defendant moves for dismissal with prejudice of plaintiff's claims for: (1)

unlawful gender discrimination in violation of Title VII of the Civil Rights Act[1]; (2) unlawful gender

discrimination in violation of Louisiana's anti-discrimination laws[2]; and (3) intentional infliction of

emotional distress pursuant to La. C.C. art. 2315. For the following reasons, the motion is

GRANTED.[3]

---

[1]Specifically, defendant has characterized plaintiff's Title VII claims as follows: (1) disparate treatment (by way of disparate work assignments and disparate pay); (2) hostile work environment; and (3) constructive discharge. [Rec. Doc. 11, p.7]

[2] Plaintiff has asserted her claims of gender discrimination under both federal and state law, and has analyzed those claims together. All parties (and this Court) agree claims asserted under the Louisiana Employment Discrimination Act, La. R.S. 23:301, *et seq.*, are analyzed under the same framework and jurisprudential precedent as Title VII claims. [Rec. Doc. 11, p.7; Rec. Doc. 15, p.3] Accordingly, plaintiff's discrimination claims brought pursuant to Louisiana law will be addressed in conjunction with plaintiff's federal discrimination claims. *See e.g.* King v. Phelps Dunbar, 743 So.2d 181, 187 (La. 1999); LaDay v. Catalyst Technology, Inc., 302 F.3d 474, 477 (5th Cir. 2002).

[3]As defendant notes in its motion, it does not seek dismissal of plaintiff's claim for overtime compensation, brought pursuant to the Fair Labor Standards Act. [Rec. Doc. 11, n.1] However, a review of the Complaint reveals in addition to her personal F.L.S.A. claim, plaintiff purports to bring an F.L.S.A. collective action on behalf of "all other similarly situated persons currently or formerly employed as a laborer by [LQT]. . . ." [Rec. Doc. 1, ¶ 5] Aside from her Complaint, plaintiff has taken no

# I. STATEMENT OF FACTS

The following recitation of the underlying facts in this matter is found in defendant's "Statement of Uncontroverted Facts." [Rec. Doc. 11-3] Factual statements numbers 1 and 2 are not in dispute:

1. Ellen Carle was employed with Living Quarter Technology [hereinafter LQT] from February, 2005 to August, 2006.

2. She was hired by Mark DesOrmeaux, President/co-owner of the company. In her interview, Carle represented that she was experienced as a carpenter/builder/cabinetmaker. She nevertheless disclosed that she had never built bunk beds or other components constructed by LQT. On the same day, she was hired as a cabinetmaker assigned to the company cabinet shop.

Factual statement number 3 is summarily disputed by plaintiff:

3. Carle started her employment under the supervision of Randall Romero, cabinet shop supervisor. [Carle depo. P. 42, Ex. A; Affidavit of Randall Romero, attached as Exhibit B] He remained her direct supervisor throughout her employment. In daily staff meetings, Romero gave assignments and instructions for each day's work. He also supervised the work of employees in the cabinet shop. Next in the chain of supervision of the plaintiff above Romero was company owner/president Mark DesOrmeaux who was also available at the worksite daily. [Carle depo. pp. 103-105, Ex. A; Deposition of Mark DesOrmeaux, pp. 29-30, 33, 37, 41, 56, excerpts attached as Exhibit C] There were other supervisors at the LQT worksite, but their oversight responsibilities were away from the cabinet shop.[4]

---

other steps in furtherance of a collective action. Additionally, in the Rule 26(f) report, plaintiff stated she did not anticipate filing any further motions or amendments to the pleadings. Due to the foregoing, any claim(s) plaintiff has asserted on behalf of others will be dismissed after the expiration of ten (10) days from issuance of this Ruling, unless plaintiff files a motion within that time frame showing she is entitled to bring a collective action, and that such an action is timely. FED. R. CIV. P. 56(c); Judwin Props., Inc. v. U.S. Fire Ins. Co., 973 F.2d 432, 436-37 (5th Cir.1992).

[4]In plaintiff's response to defendant's Statement of Uncontroverted Facts, she merely responds, "Plaintiff disputes this fact." [Rec. Doc. 15-5, p. 3] Although nothing more is stated, from the briefing, it appears plaintiff does not actually oppose statement of fact number 3. Rather, it appears plaintiff argues the statement is incomplete, in that plaintiff asserts other LQT employees besides Romero also acted as her supervisors. [See e.g. Rec. Doc. 15, p. 13 "The various harassers are: Pat Schexnayder (plaintiff's immediate supervisor), Keith Hidalgo (plaintiff's co-worker/defacto supervisor), Shey Stakes (plaintiff's superior). . . .")] The Court notes plaintiff has provided no evidence in support of this assertion, save

Factual statements numbers 4 and 5 are undisputed:

4.      During her employment, there were three other employees doing work similar to Carle's, including Romero himself, who acted as a working supervisor. The other two employees were Keith Hidalgo and Luke Abbott. Carle was the only female cabinetmaker, but she was not the only female employee at the worksite.

5.      Carle was assigned to build and/or repair cabinets, lockers and other components for portable living quarters rented by Living Quarter Technology to offshore clients.

Factual statements numbers 6 - 11 are summarily disputed by plaintiff[5]:

6.      Cabinetmaking tasks performed by Carle and others were assigned based on abilities and quality of work. Cabinetmaker pay was not affected by individual production. No jobs were any more lucrative than others; none were more prestigious than others. [Carle depo. pp. 59, 201, Ex. A; Romero Affidavit, Ex. B]

7.      During her employment, Ellen Carle received at least three pay raises. After six months of employment, her hourly pay was raised by $1.00/hour. [Carle depo. p. 59, Ex. A] She received a $.50/hour raise after she did good work on a special project. [Carle depo. pp. 77-79, Ex. A] She received another raise in early 2006. [Carle depo. p. 174, Ex. A] At the time she resigned her employment, she was earning $17.00/hour, and she was the highest paid cabinetmaker in the company cabinet shop. [Carle depo. pp. 79, 174, Ex. A]

8.      At all times during her employment, Ellen Carle was considered to be a satisfactory, though not outstanding employee. She received positive feedback about her work from her supervisors Randy Romero and Mark DesOrmeaux, and she earned at least one pay raise based on merit for extra work. No LQT supervisor was ever critical of her overall work. [Carle depo. pp. 95-96, 162, 226, Ex. A; Romero Affidavit, Ex. B]

9.      From the start of their working relationship, Carle and co-employee Keith Hidalgo had workplace conflicts and obvious differences of opinion regarding

---

plaintiff's self-serving testimony. [Rec. Doc. 15, pp.13, 23] *See* Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(the burden on summary judgment is not satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or by only a "scintilla" of evidence.)

[5]All responses to these factual statements merely state either: "Plaintiff disputes this fact," or "Plaintiff disputes this fact as written." [Rec. Doc. 15-5]

the performance of work in the cabinet shop. Carle questioned Hidalgo's abilities and challenged his work methods. [Carle depo. pp. 64, 97-98, Ex. A] Hidalgo considered Carle to be too independent and resistant to established company work methods and practices. [Deposition of Keith Hidalgo, pp. 11-12, 15, 27, excerpts attached as Exhibit D] They had little to do with one another in the workplace. [Carle depo. p. 96, Ex. A] Keith Hidalgo did not have supervisory authority over Carle, and he had been with Living Quarter Technology only one month longer than Ellen Carle. [Carle depo. pp. 76, 92, Ex. A; M. DesOrmeaux depo. pp. 37-38, Ex. C; Hidalgo depo. pp. 12, Ex. D]

10. In November, 2005, Ellen Carle and her sister were arrested. The arrest received significant press coverage in the area, and it was a difficult time for Carle. She nevertheless continued to work in her regular position, and she was allowed extra paid leave time during that period to handle personal matters, a decision made by Mark DesOrmeaux. [Carle depo. pp. 189, Ex. A]

11. On or about March 6, 2006, Carle had been working to build cabinet doors for a project she understood to be important to her supervisors. She decided to construct the doors in a design and manner different from that used routinely on similar company units. [Carle depo. pp. 82-88, Ex. A; Hidalgo depo. pp. 11-17, Ex. D; Romero Affidavit, Ex. B] When Hidalgo, who had the plans for the unit, discovered Carle's change, he became angry that she had deviated from the plans, and he wrote a message to Carle on one of the doors she had made, placing it at her workplace. The message was "Wrong Jezebel." Ellen Carle was offended and angry at Hidalgo's actions, and she reported the incident immediately to company President Mark Hidalgo. [Carle depo. pp. 82-88, Ex. A; M. DesOrmeaux depo. pp. 59-60, Ex. C] The 'Jezebel incident' and Carle's complaint were promptly investigated by and at the direction of DesOrmeaux. Hidalgo admitted his actions and his anger at Carle's disregard for routing workplace practices and methods. He acknowledged his judgment error and classified the action as a 'bad joke.' [Hidalgo depo. pp. 11-17, Ex. D] Mark DesOrmeaux met with Carle to discuss his investigation and his resulting decisions. He indicated to Carle that he would fire Hidalgo, but Carle responded that she did not believe that was necessary. [Carle depo. pp. 87-88, Ex. A; M. DesOrmeaux depo. p. 53, Ex. C] Hidalgo was reprimanded and told that if he acted similarly in the future he would be terminated. He was also told that he would be denied a raise at the upcoming review period. [M. DesOrmeaux depo. pp. 59-60, Ex. C; Hidalgo depo. pp. 11, 36, Ex. D] Carle was told that she should immediately report any further problems with Hidalgo to Mark DesOrmeaux and that Hidalgo would be terminated. [M. DesOrmeaux depo. p. 60, Ex. C] At the next review period, Carle's pay was increased, and she earned more than Hidalgo from that date. Hidalgo did not receive a raise. [Carle depo. pp. 172, 174, Ex. A; Hidalgo depo. p. 36, Ex. D; M. DesOrmeaux depo. p. 63, Ex. C]

Factual statement number 12 is undisputed:

12. In early August, 2006, Ellen Carle had another conflict with another co-employee (a plumber) over use of a company fan in the workplace. The employee was not assigned to Carle's work area, and he was not a carpenter or supervisor for the company. The two had a heated exchange, and the plumber later complained about Carle's actions. Carle herself lodged no complaint about the incident.

Factual statements numbers 13 - 15 are summarily disputed by plaintiff:

13. On August 31, 2006, Ellen Carle had a meeting with LQT Vice President Shea Stakes and her supervisor Randy Romero. She had asked to meet with owner/president Mark DesOrmeaux, but since he was on vacation and Carle expressed some urgency about the need for a meeting, she agreed to meet with Stakes and Romero. [Carle depo. Pp. 156, Ex. A; Deposition of Shea Stakes, p. 22, with attachments, excerpts attached as Ex. E; Romero Affidavit, Ex. B] She indicated to them that she needed time to deal with personal issues associated with her sister's criminal matters. She presented two options which Stakes interpreted to be an ultimatum. The company could allow Carle three months off with pay, to take care of her personal matters, after which she would return to work. Or, she would accept six months off with pay, after which she would resign her employment. Neither Stakes or Romero had authority to consider Carle's proposal, but neither option was acceptable to the company, and Carle never returned to work after August 31, 2006. [Carle depo. pp. 156, Ex. A; Stakes depo. pp. 18-19, 22, 26-27, Ex. E; Romero Affidavit, Ex. B]

14. Ellen Carle liked her job at Living Quarter Technology. She liked what she was doing, and she received positive feedback on her work during the entire period of her employment. [Carle depo. pp. 156, 204-06, Ex. A]

15. Aside from the single complaint referenced above as 'the Jezebel incident,' Ellen Carle lodged no complaints regarding her working conditions, her fellow employees or any other of the incidents now described in allegations in the captioned matter. [Carle depo. pp.68-69, 91, 120, 126-127, Ex. A; M. DesOrmeaux depo. pp. 46-49, 51, 53-54, 56, 58, 62-63]

Factual statement number 16 is undisputed:

16. Ellen Carle sought no other employment after her resignation, choosing to focus on personal issues. She was incarcerated from November 1, 2007 to early 2008 in the Lafayette Parish Correctional Center, which situation prevented any employment.

Factual statement number 17 is summarily disputed by plaintiff:

> 17. During the time Ellen Carle was employed at Living Quarter Technology, the company had in place policies and procedures designed to prevent and address discrimination and harassment in the workplace. [Policy statement attached to Affidavit of Leigh Babin at Exhibit F] When she was hired, Ellen Carle heard from the company owner/president that he would not tolerate harassment in the workplace. [Carle depo. Pp. 168, Ex. A] She was also told that she could take complaints beyond the Abbeville worksite to the company's Baton Rouge office. [M. DesOrmeaux depo. p. 54, Ex. C]

[Rec. Doc. 11-2; Rec. Doc. 15-5][6]

## II. LAW AND ANALYSIS

### A.  Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in <u>Lindsey v. Sears Roebuck and Co.</u>, 16 F.3d 616, 618 (5th Cir. 1994):

---

[6]Although plaintiff states she disputes factual statement number 18, defendant did not provide a statement number 18. (Defendant listed 17 separate statements of uncontested facts.)

When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also,* Moody v. Jefferson Parish School Board, 2 F.3d 604, 606 (5th Cir.1993); Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Lujan v. National Wildlife Federation, 497 U.S. 871, 884 (1990)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The Court later states:

In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence set forth specific facts showing that there is a genuine issue for trial. The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

Id. at 888-89 (1990)(internal quotations and citations omitted).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." Roberts v. Cardinal Servs., 266 F.3d 368, 373 (5th Cir. 2001).

**B.**     **Discrimination in violation of Title VII and La. R.S. 23:301**

Title VII of the Civil Rights Act of 1964 provides in pertinent part: "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2. "A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." Russell v. McKinney Hosp. Venture, 235 F.3d 219,  222 (5th Cir. 2000). "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e. unlawful

discrimination) without any inferences or presumptions." Bodenheimer v. PPG Industries, Inc., 5 F.3d 955, 958 (5th Cir. 1993). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973)." Russell at 222.

In a matter involving proof via circumstantial evidence, plaintiff must first establish a *prima facie* case of unlawful gender discrimination in violation of Title VII. Id. If a plaintiff is successful in establishing a *prima facie* case of discrimination, the burden then shifts to defendant to produce a legitimate, non-discriminatory justification for its actions. Id. If the defendant can articulate a reason that, if believed, would support a finding that the action was nondiscriminatory, "the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out of the picture and the fact finder must decide the ultimate question: whether the plaintiff has proved intentional discrimination." Russell at 222 (5th Cir. 2000) (internal citations and quotations omitted). The Supreme Court has stated, "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146 (2000).

"Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148. "The Supreme Court has also made clear, however, that "instances [exist] where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Okoye v. University of Texas Houston Health Science Center, 245 F.3d 507, 514 (5th Cir. 2001)(citing Reeves at 148). Finally, "Title VII ... do[es] not protect against

unfair business decisions[,] only against decisions motivated by unlawful animus." Nieto v. L&H Packing Co., 108 F.3d 621, 624 (5th Cir. 1997)(punctuation in original)(quoting Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1257 (5th Cir. 1997), *overruled on other grounds*).

### 1. **Disparate Treatment**

In this matter, this Court, for these purposes only, will assume plaintiff alleges she was discriminated against by way of disparate treatment, in that she alleges "many male co-workers with less experience than Plaintiff received higher compensation for their work." [Complaint ¶ 8a] Additionally, plaintiff alleges "the more lucrative job assignments were given to other male employees, with less experience than Plaintiff, while Plaintiff was forced to work on insignificant projects."[7] [Id.¶ 8b] To establish a *prima facie* case of disparate treatment, plaintiff "must provid[e] evidence that she: (1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) . . . that others similarly situated were treated more favorably." Okoye at 512-513 (internal quotations omitted). The fourth element requires a showing "that the employer gave preferential treatment to another employee under 'nearly identical' circumstances . . . ." Id. at 514 (internal quotations and punctuation omitted).

---

[7]Defendant has addressed a claim of disparate impact, due to the allegations (quoted above) contained in plaintiff's complaint. However, plaintiff has not specifically addressed a claim of disparate treatment in her opposition memorandum, beyond a brief recitation of the *prima facie* elements. Rather than support a distinct claim of disparate treatment, plaintiff instead uses her factual allegations regarding "disparate treatment" (which are contained in the section of her brief addressing constructive discharge) to defeat defendant's argument that any employment decisions it made were based upon legitimate, nondiscriminatory reasons. [Rec. Doc. 15, pp. 10-11] Stated otherwise, plaintiff does not apply her factual allegations to the *prima facie* elements of a disparate treatment claim, but rather, uses those factual allegations to show defendant's justification for its actions is false, and was made to "cover up a discriminatory purpose." *See* Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146 (2000). Thus, plaintiff has skipped a crucial step in the analysis: namely, plaintiff has failed to address defendant's contention that there is an absence of evidence as to plaintiff's *prima facie* burden for a claim of discrimination by way of disparate treatment.

As stated by the Supreme Court:

> In a disparate treatment case, liability depends on whether the protected trait ... actually motivated the employer's decision. The employer may have relied upon a formal, facially discriminatory policy requiring adverse treatment of employees with that trait. Or the employer may have been motivated by the protected trait on an ad hoc, informal basis. Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.

Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)(citations omitted). In other words, in this matter, plaintiff must show LQT paid similarly situated male co-workers higher compensation, or gave similarly situated male co-workers more lucrative job assignments, because LQT was motivated by unlawful animus (gender), and that animus "had a determinative influence on the outcome." Id.

In this matter, defendant agrees plaintiff can meet the first two elements of her *prima facie* burden, but argues the evidence is insufficient as to the third and fourth elements. As noted in defendant's statement of uncontested facts, "At the time she [plaintiff] resigned her employment, she was the highest paid cabinetmaker in the company cabinet shop." [Rec. Doc. 11-2, ¶ 7; *see also* plaintiff depo., p. 174 ("Okay, my point is that this is all I heard when I was there, I was doing a good job. This pay raise came after the Jezebel thing when I said that I was upset about not being paid like everybody else. I think that this fifty cents might have put me twenty-five cents above Keith at that time."); DesOrmeaux depo., p. 63 (After Mr. Hidalgo was reprimanded, plaintiff "made more than any of the other cabinet makers.")] Although plaintiff summarily responds, "Plaintiff disputes this fact," she has provided no evidence to the contrary. [Rec. Doc. 15-5, ¶ 7; *see also* Rec. Doc. 15-1, p.11] The Court finds the evidence supports defendant's position.

The only *supported* allegation plaintiff makes with regard to her pay is that "Luke, one of plaintiff's co-workers, was a twenty-four year old male with less carpentry experience than plaintiff

and who was hired over a year after plaintiff, started out his employment with Living Quarter Technology by making more money than plaintiff did, although plaintiff had been with the company for over a year." [Rec. Doc. 15, p.11] However, by plaintiff's own testimony, Mr. Abbott was the most talented person in the cabinet shop. Plaintiff additionally testified LQT raised its starting salary offer to Mr. Abbott, when it learned he was going to accept employment with another employer who had offered him a higher starting wage. [Plaintiff depo., pp. 97, 101-102] By contrast, LQT considered plaintiff's work "satisfactory and acceptable, though not exemplary." [Romero aff., ¶ 9] Additionally, although Mr. Abbott was hired at a higher wage than plaintiff when she was hired a year prior, the fact that plaintiff was the highest paid cabinet maker when she terminated her employment undercuts her assertion that the pay differential was motivated by gender-based animus. Due to the foregoing, the Court finds the evidence on this issue establishes there exists no genuine issue of material fact as to disparate pay, because plaintiff has failed to provide any evidence that gender was a motivating factor in setting plaintiff's starting salary or Mr. Abbott's. *See e.g.* Wallace v. Texas Tech University, 80 F.3d 1042, 1049 (5th Cir. 1996)(Uncontradicted evidence that white assistant men's basketball coach was paid $57.83 per month more than African-American assistant coach because of white coach's significantly greater college coaching experience was sufficient to establish that disparity in pay between the two assistant coaches was not based on race); Pouncy v. Prudential Ins. Co. of America, 668 F.2d 795, 803 (5th Cir. 1982)("Different job levels, different skill levels, previous training, and experience: all may account for unequal salaries in an environment free of discrimination.").

As to plaintiff's assertion "the more lucrative job assignments were given to other male employees, with less experience than Plaintiff, while Plaintiff was forced to work on insignificant

projects," the Court finds this allegation is also insufficient to carry her *prima facie* burden for disparate treatment. First, there is no evidence any specific cabinetry jobs were "more lucrative" than others, and plaintiff's testimony admits as much. Each cabinet maker was paid a salary for all work completed, regardless of productivity, specific job assignment, etc. [Plaintiff depo., pp. 59, 201; Romero aff., ¶ 9] Second, assuming plaintiff uses the term "lucrative" to mean "preferable," her assertions (taken as true) are still insufficient to carry her *prima facie* burden. Citing verbatim from plaintiff's opposition memorandum, plaintiff's alleges as follows:

Q. Okay, how was your work different?
A. They just gave me little piddle things to do. Randy never showed me how to build a bunk bed or anything else, and a lot of times when he gave me directions, they were wrong, and I have thought about it since then, and I'm convinced he did it on purpose. (See Exhibit A, Deposition of Ellen Carle, p. 52).
* * *
Q. It sounds like you felt that the work that was being done by the others was somehow better work?
A. It was better work.
Q. And why do you say that?
A. Well, they had all—they were doing the new buildings more—you know, I would only do a piece of a building, you know, one little cabinet or something, and they would be building everything else, you know. They would just give me something—they would give me enough to keep me busy to where if Mark walked in there, it looked like I was doing something. (See Exhibit A, Deposition of Ellen Carle, p. 56).
* * *
Q. And so you believe that that work was somehow lesser than the work that they were doing?
A. It was—well, yes, sure it was. (See Exhibit A, Deposition of Ellen Carle, p. 63).
* * *
Q. Do you believe that Pat and any of those other guys that you've referenced refuse to help you because you're a woman?
A. Yes, I sure do.
Q. And what's the basis for that belief?
A. Well, I—there was never a man there that got refused any—I mean, they always helped you—any time one person did something, he always had a helper. I don't care who it was. The plumber had a helper, the car—the framing carpenters had helpers, the electricians had helpers, Randy and Keith. I was never given anybody to work, you know, with, to help me.

Q. And you believe that's because you're a woman?
A. Yeah.
Q. I mean, has anybody ever told you that? Do you have anything specific that you can point me to?
A. Well, I think when all the men are treated one way and I'm treated completely different, I think that's an indication, you know.

[Rec. Doc. 15, pp. 4-5]

As to plaintiff's allegation she was only given "little piddle things to do," she has provided nothing more than her *subjective* belief that this was due to her gender. Plaintiff's "subjective belief that she was discriminated against is not enough to avoid summary judgment." Watts v. Entergy Operations, Inc., 247 F.3d 241, *2 (5th Cir. 2001)(citing Grimes v. Texas Dept. of Mental Health, 102 F.3d 137, 140 (5th Cir. 1996). Moreover, "Title VII ... do[es] not protect against unfair business decisions[,] only against decisions motivated by unlawful animus." Nieto, *supra*. As plaintiff has failed to establish the jurisprudentially required *prima facie* case of unlawful gender discrimination by way of disparate treatment, Rule 56 mandates the entry of summary judgment in favor of defendant as to this claim. *See* McDonnell Douglas Corp., *supra*; Lujan, *supra*.

1. **Hostile Work Environment**

Plaintiff alleges she was subjected to a hostile work environment. Plaintiff can establish unlawful discrimination in violation of Title VII by proving she was subjected to gender-based harassment, which created a hostile or abusive working environment. Harvill v. Westward Communications, L.L.C., 433 F.3d 428, 434 (5th Cir. 2005). As pronounced in Harris v. Forklift Systems, Inc.:

When the work place is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.

> This standard ... takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.

Harris, 510 U.S. 17, 21 (1993)(some internal citations and quotations omitted). Incidents of sexual harassment must be more than episodic to rise to the level of a hostile work environment - "they must be sufficiently continuous and concerted in order to be deemed pervasive." Faragher v. City of Boca Raton, 524 U.S. 775, 787 n.1 (1998). Additionally, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." Id. at 787.

In order to establish a prima facie case of discrimination premised upon the theory of hostile work environment, plaintiff must show the following: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment of which plaintiff complained was based on sex/gender; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. Harvill v. Westward Communications, LLC, 443 F.3d 428, 434 (5th Cir. 2005); Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir.2002). Where the harassment is allegedly committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff need only satisfy the first four elements listed above. Celestine v. Petroleos De Venezuellas SA, 266 F.3d 343, 354 (5th Cir.2001).

As touched upon above, in order to affect a term, condition, or privilege of employment (element 4), the harassment complained of must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Celestine

(internal quotations omitted).  In making this determination, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. (internal quotations omitted). [8]  "'[M]ere utterance of . . . [a gender based] epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII."  Faragher at 787 (alterations in original) (quoting Rogers v. E.E.O.C., 454 F.2d 234, 238 (5th Cir. 1972).  Likewise, "discourtesy or rudeness should not be confused with . . . [sexual] harassment and . . . a lack of . . . [gender] sensitivity does not, alone, amount to actionable harassment." Id.

As noted by the Faragher court:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.  Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.  We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment. . . .

Faragher at 786-88(internal citations and quotations omitted).

As summarized by the Fifth Circuit:

> Sexual harassment which does not culminate in an adverse employment decision must, to create a hostile work environment, be severe or pervasive. . . . All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.  The extreme facts recited in those cases highlight the intensity of the objectionable conduct that must be present in order to constitute an actionable hostile environment claim.

---

[8]An isolated, single incident of harassment can alter the terms and conditions of employment *if* it is sufficiently egregious.  Harvill v. Westward Communications, L.L.C., 433 F.3d 428, 435 (5th Cir. 2005).

Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264 (5th Cir. 1999)(citing Oncale v. Sundowner

Offshore Servs., 523 U.S. 75 (1998); Faragher, *supra*; Harris, *supra*; Meritor Sav. Bank, FSB v.

Vinson, 477 U.S. 57 (1986); and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)). The Indest

further notes:

> What constitutes an actionable claim for a sexual hostile working environment is a fact-sensitive determination, but the Supreme Court's decisions strongly suggest that such allegations are not invariably to be resolved by the jury. According to the [Supreme] Court, this claim is undergirded by requirements of severity and pervasiveness, viewed in the plaintiff's entire employment context from an objective standpoint. Cases will vary widely, as there is a continuum of sexually-categorized behavior ranging from the use of diminutives like "sweetie-pie" on one extreme to physical assault on the other, and the commingling of particular conduct, words and working environments may form a complex stew. But claims of non-severe, non-pervasive harassment are excluded from Title VII. Motions for judgment as a matter of law can police the baseline for hostile environment claims.

Id. at 264, n.8.

Plaintiff alleges the following facts, which are applicable to her claim of discrimination,

predicated upon the theory of "hostile work environment":

- On a Friday in March of 2006, plaintiff and others were advised by Keith Hidalgo they had a very important project to do. According to plaintiff, during this time Mr. Hidalgo was an "acting supervisor," because Randy Romero had left the cabinet shop and was working in the office. Plaintiff states Mr. Hidalgo did not show up for work that weekend, and no one had given the employees any specific instructions as to how to complete the work. Plaintiff states she decided to make "raised panel doors," because she had previously made such doors for Mr. Desormeaux's personal property, and he had liked them. When Mr. Hidalgo came in on Monday, "he was furious . . . he was mad as he could be that it was something different. . . ." [Id. at 82-3] Mr. Hidalgo wrote "Wrong Jezebel" on the door and signed his name. Plaintiff notes Mr. Hidalgo admits in his deposition that he was trying to insult Ms. Carle by using the word "Jezebel." He stated his understanding is that Jezebel was a female bible character, who refused to submit to male authority, and "basically that she ran the kingdom, but she bossed her husband and she just ran the kingdom and that's about it." [Hidalgo depo. pp. 16-17][9]

---

[9]Defendant points out that after plaintiff reported the "Jezebel incident" to Mr. Desormeaux, he immediately commenced an investigation. [Rec. Doc. 11, p. 14] When Mr. Desormeaux indicated he would fire Mr. Hidalgo, plaintiff advised Mr. Desormeaux she did not think that was necessary. [Id.

- Plaintiff alleges Pat Schexnayder and Shea Stakes would "rub their hand up and down my back to see if I was wearing a bra and stuff like that." [Plaintiff depo. p. 99] Plaintiff stated this behavior happened a lot." [Id.] Plaintiff states she knew they were attempting to see if she was wearing a bra, because the cleaning lady told her so. [Id. at 99-100] When asked how she would respond to their touching her back, plaintiff replied:

  > I moved away. I mean, there were some - - I would have had to have been in that office every day complaining, and when you're a new employee, you know, you sort of hesitate, and then - - it was about the time I got that 50 cent raise that I really started raising a big stink about it because things had gotten so out of whack.

  [Id. at 101] When asked if plaintiff ever reported the back rubbing incident to Mark Desormeaux or Shea Stakes, she replied, "No. I would have had to have been in that office every single day. I think that my - - I would have gotten fired after a while just - - you know, I mean, that just makes you sound like all you want to do is complain." [Id. at 121] Plaintiff additionally admits she never complained to the alleged perpetrators because she "didn't want to start an issue right in the - - you know, a group of men like that. . . . [Id. at 121][10]

- Plaintiff alleges an employee from another department, who was called "Big D," as well as other employees would "tell the nastiest jokes they could and see if I would get embarrassed." [Plaintiff depo., p. 121] When asked if she told anyone she was offended, plaintiff replied she complained to Big D. She further states, "And I told him because he would, you know, grab his crotch and do stuff like that and tell just sleazy jokes, and I told him I didn't want to hear it. . . ."

- On another occasion, plaintiff states the following occurred: "Well, when I was answering the phone once, he [Mr. Stakes] came in with D, that D Box, and you know his name is Shea Steak [sic], with a K like steak, asked me if I'd like to have some stuffed Steak, and he and D just had a big laugh about that." Plaintiff further states she did not respond, but rather "just got up and left." She never reported the incident to a supervisor. [Plaintiff depo., p. 125]

---

(citing plaintiff depo. pp. 87-88)] Nevertheless, Mr. Hidalgo was reprimanded and told that if he acted similarly in the future, he would be terminated. He was also told he would be denied a raise at the upcoming review period. [DesOrmeaux depo. pp. 59-60; Hidalgo depo. p. 11, 36] Plaintiff was instructed to immediately report any further problems with Mr. Hidalgo to Mark DesOrmeaux. [DesOrmeaux depo. p. 60] At the next review period, plaintiff's pay was increased, and she earned more than Mr. Hidalgo from that date forward. Mr. Hidalgo was denied a raise during the same review period. [Carle depo. pp. 172, 174; Hidalgo depo. p. 36; DesOrmeaux depo. p. 63] No further complaints were made by plaintiff regarding Mr. Hidalgo. [Plaintiff depo., pp. 87-88]

[10]Defendant notes there is no report of the above "alleged incidents or any offensive touching in Carle's Charge of Discrimination, filed with the EEOC." [Rec. Doc. 11, p. 15]

- Plaintiff states Mr. Stakes wanted to know about all - - you know, my sex life. Told me his was lousy, you know. Said he just had to have it every day, you know, wanted to talk about how bad his wife was and stuff like that, and I told him I didn't want to hear it, and I didn't - - you know." [Plaintiff depo., p. 126] Plaintiff states that particular conversation only happened one time, but "he asked me several times if he couldn't come over early in the morning to my house. I told him no." [Id. at 126] Plaintiff states she understood that to mean he wanted to come to her house and have sex. [Id. at 127] Plaintiff admits she did not report these incidents to Mr. Desormeaux. She first denies anyone else was ever present during those conversations, but later seems to recant, and states Mr. Stakes asked if he could go to her house "in front of a group of people, but it was a whole group of people, and I can't tell you - - you know, if was like maybe before a morning meeting or right after a morning meeting. . . . No, it happened more than once in front of other people." [Id. at 127-128] When asked if she could name any of those persons, she replied she would have to name everyone who attended the morning staff meetings. When asked if the conversations did indeed occur at staff meetings, plaintiff replied, "Yea, they - - it happened at staff meetings, it happened when I was there by myself, it happened, you know, all the time." [Id. at 128][11]

- Plaintiff alleges on one occasion she "went out to where they were doing that offshore job, and, you know, they made allusions about oral sex and stuff when I was out there." [Id. at 192-193] Plaintiff is not certain who made the comment, but she thinks it was Pat Schexnayder. When asked specifically what this person said, plaintiff responded, "he just said, you know, look whose on her knees and laughed because I was putting a little pocket hole, you know, door pulls in, a lock for it, and he said that, and, you know, several people just started laughing." [Id. at 193][12] There is no evidence in the record that this incident was ever reported by plaintiff.

To summarize, accepting plaintiff's allegations as true, the following incidents occurred which could be argued as having created a hostile working environment: the Jezebel incident (which the Court notes is the only incident plaintiff reported to a supervisor, specifically Mr. DesOrmeaux, who took prompt action to remedy the situation); the touching of plaintiff's back, which plaintiff believes was done in order to determine if she was wearing a brassiere; "Big D," a co-employee in

---

[11]Mr. Stakes (who primarily works in the office, rather than the cabinet shop where plaintiff worked) denies plaintiff ever came to him to complain about anything he had said or done in the workplace. He further states the only discussions he had with plaintiff regarding her complaints were when she resigned her employment. [Stakes depo., pp. 16, 21-22] He additionally denies making any of the offensive statements plaintiff attributes to him, and also denies ever hearing anybody else make any of the offensive statements of which plaintiff complains. [Id., pp. 18, 25]

[12]Defendant notes plaintiff did not report this incident to her supervisor. [Rec. Doc. 11, p. 14]

another department, would tell "sleazy jokes" and "grab his crotch"; Mr. Stakes made a joke referencing "stuffed steak," which offended plaintiff; Mr. Stakes would frequently talk about his sex life and inquire about plaintiff's sex life; on one occasion a comment was made (although uncertain, plaintiff believes the comment was made Mr. Schexnayder), which plaintiff interpreted to be a reference to oral sex.[13]

The Court finds, viewing the totality of the circumstances in the light most favorable to plaintiff, a reasonable jury could not find the conduct plaintiff alleges was sufficiently severe or pervasive to alter a term or condition of her employment as defined by the existing jurisprudence, and thus, plaintiff has not established a *prima facie* case of hostile work environment. Although plaintiff alleges the inappropriate conduct was frequent, the Court finds when evaluated against existing Fifth Circuit jurisprudence, it was not sufficiently "severe" (as that term is defined in the jurisprudence)[14], it was not physically threatening, and there is no indication the conduct interfered with plaintiff's work performance. Celestine, *supra*. Plaintiff never reported any of these offensive

---

[13]The Court notes, with the exception of the Jezebel incident and the incidents involving "Big D," the remainder of the allegations were committed by persons plaintiff alleges were her supervisors and/or superiors. However, for the reasons which follow, the Court need not address that allegation.

[14]*See* Gibson v. Potter, 264 Fed.Appx. 397, 401 (5th Cir. 2008)("Unlike the offensive conduct in McKinnis and Harvill, the conduct here consisted of one non-consensual physical touching, which was promptly investigated . . . . [Plaintiff's] other allegations are unsubstantiated and analogous to the 'boorish and offensive' comments in Shepherd; they do not rise to the level of severity or pervasiveness required by the law."); Lauderdale v. Texas Dept. of Criminal Justice, Institutional Division, 512 F.3d 157, 164 (5th Cir. 2007)(harassing conduct was "pervasive," where plaintiff's supervisor called her 10 to 15 times a night for almost four months to make advances toward her, would show up to the building where she worked, pull her toward him with her back touching his stomach); Shepherd v. Comptroller of Pub Accounts, 168 F.3d 871, 872-74 (5th Cir. 1999)(mere utterances of epithets that engender offensive feelings spanning over a year did not qualify as severe or pervasive); *but see* McKinnis v. Crecent Guardian, Inc., 189 Fed.Appx. 307, 310 (5th Cir. 2006) (holding that chronic unwanted touching for a year, resulting in plaintiff's resignation, qualified as severe and pervasive); Harvill v. Westward Communications, 433 F.3d 428, 435-36 (5th Cir. 2005)(unwanted touching of plaintiff's breasts and buttocks over a seven month period, despite her protest on every occasion, qualified the behavior as sufficiently severe or pervasive).

incidents to her superiors, with the exception of the "Jezebel incident," which was promptly and satisfactorily addressed by Mr. DesOrmeaux, the President and co-owner of LQT. (Plaintiff has offered no explanation as to why she did not complain about these other alleged incidents to Mr. DesOrmeaux, despite her previous success with that course of action.) While plaintiff's other allegations could constitute "boorish and offensive" comments, they do not rise to the level of severity or pervasiveness required under the law. Again, as previously noted:

> Sexual harassment which does not culminate in an adverse employment decision must, to create a hostile work environment, be severe or pervasive. . . . All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment. The extreme facts recited in those cases highlight the intensity of the objectionable conduct that must be present in order to constitute an actionable hostile environment claim.

Indest, at 264. Accordingly, the Court finds plaintiff has not established the jurisprudentially required *prima facie* case of discrimination by way of a hostile work environment, and therefore that claim is DENIED.[15]

_____

[15]Even were this Court to find the conduct which plaintiff alleges was sufficiently severe and pervasive to state a claim for hostile work environment, it nevertheless would deny the claim on the basis of the affirmative defense set forth in Ellereth & Faragher. Employers may assert an affirmative defense to claims of vicarious liability for sexual harassment carried out by supervisors in their employ. The affirmative defense is only available if no tangible employment action is taken against the aggrieved employee. To satisfy the affirmative defense, the employer must show by a preponderance of the evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth at 765; *accord* Faragher at 808. In this matter, not only had LQT exercised reasonable care to prevent and promptly correct sexually harassing behavior on a previous occasion (i.e., the Jezebel incident), it also had in place a clearly-worded policy against sexual harassment, which was disseminated to all employees. [Affidavit of Leigh Babin, Ex. F] Nevertheless, plaintiff unreasonably failed to take advantage of the same or similar preventative and/or corrective opportunities provided by LQT for other alleged incidents, which plaintiff claims were "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris at 21. In short, plaintiff has offered nothing more than vague and unsubstantiated argument to defeat LQT's assertion of the Ellerth/Faragher defense.

## 2. **Constructive Discharge**

Plaintiff alleges she was constructively discharged because of her gender. [Rec. Doc. 15, p.4] To state a *prima facie* claim of discrimination (by way of constructive discharge), plaintiff must establish: (1) she belongs to a protected group; (2) she was qualified for her position; (3) she was dismissed or suffered an adverse employment action; and (4) LQT sought to replace her with a similarly qualified person outside of the protected class. *See e.g.* Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir. 1997). The first two elements of plaintiff's *prima facie* claim are not in dispute. Thus, the Court turns to the third element: whether plaintiff was dismissed or subjected to an adverse employment action. Plaintiff argues she "suffered an adverse employment action in that she was constructively discharged because she was a woman." [Rec. Doc. 15, p.4; *see also* Id. at p.10]

When an employee resigns (as did Ms. Carle), she may satisfy the adverse employment action requirement by proving "constructive discharge." Barrow v. New Orleans S.S. Ass'n., 10 F.3d 292, 297 (5th Cir. 1994). "To show constructive discharge, an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign." Id. "Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim. Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge . . . ." Brown v. Kinney Shoe Corp. 237 F.3d 556, 566 (5th Cir. 2001).

As described by the Fifth Circuit, "[P]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 310 (5th Cir. 1987)(internal quotations omitted). Stated more simply, plaintiff's resignation must have been reasonable under all circumstances. Barrow at 297.

Whether a reasonable employee would feel compelled to resign is a fact specific inquiry, but the Fifth Circuit considers the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not. Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 481 (5th Cir. 2008).

In support of her argument she was constructively discharged, plaintiff's counsel has quoted portions of plaintiff's deposition testimony, spanning almost 200 pages. In sum (and construed in the light most favorable to plaintiff), the relevant, quoted testimony contains the following allegations:

- Plaintiff was given only "little piddley things to do," whereas her male counterparts were given "better work. Plaintiff believes Keith Hidalgo (another cabinetmaker) and Randall Romero ("Cabinet Shop Supervisor" and plaintiff's immediate supervisor) "let him [Luke Abbott - another cabinetmaker] do stuff immediately, whereas they did not let me do it - you know, they didn't spend any time letting me do anything." [Plaintiff depo., pp.52, 81-82][16]

- Other employees were provided "helpers," whereas plaintiff was not. [Id. at 72-3][17]

---

[16]Defendant notes, this statement is entirely based on plaintiff's subjective belief. [Rec. Doc. 11, p. 9 ¶ 4]

[17]As defendant correctly notes, plaintiff testified she did not need a helper for much of her work, but it would have been useful on larger pieces of work. On one occasion plaintiff admits she was assigned a helper, but he left the work area and did not assist her. Plaintiff is of the opinion this was due to a possible drug problem. Plaintiff never reported the incident to her supervisors, and there is no evidence that her gender was a factor in this situation. At her deposition plaintiff indicated plumbers, framing carpenters and electricians had helpers, as well as her supervisor Randall Romero, however, none of these positions are legitimately comparable to plaintiff's work assignment or employment status. [Carle depo., pp. 66-70]

- Plaintiff believes one of the other cabinetmakers (Luke Abbott) was paid more than she, although he had less experience. [Id. at 81-2][18]

- The Jezebel incident.

- Plaintiff asserts on another occasion, Mr. Hidalgo intentionally kicked and broke the face frame of a base cabinet on which plaintiff was working.[19] [Id. at 89-90]

- According to plaintiff, on one occasion, Mr. DesOrmeaux instructed Pat Schexnayder to show the employees what their work tasks were to be that day, but he did not show plaintiff. Plaintiff took this to be an indication "that he - he did not think I was equal to anybody out there." [Id. at 107][20]

- Toward the end of her employment, plaintiff felt "there was a definite getting together of people to just drive me out of the place." [Id. at 118]

- Randy Romero would make it difficult for plaintiff to work past 5:00 p.m. by, for example, locking her keys in the cabinet shop on one occasion and then "laughing about it" when plaintiff could not find him promptly; she vaguely alleges similar incidents occurred "at the new shop." [Id.]

- On August 31, 2006, plaintiff met with Mr. Stakes and Mr. Romero. Although plaintiff states she originally intended to remain at her job until retirement, she asserts "it had gotten so bad . . . I knew that I couldn't stay there because everybody - you know, people can't be ugly to you so long and then just switch, as far as I'm concerned, and so I told them that I would - I don't remember what I told them about - that I wanted to be paid up to so far and I would just be gone. . . . I did say that I would take a certain amount and just be gone. . . . I do remember that during that meeting he [Shea Stakes] said that they would probably never hire another woman." [Id. at 156-57][21]

---

[18]Plaintiff admits in her deposition that Abbott is "very talented" and a "natural carpenter." She additionally admits LQT raised its starting salary for Abbott, when it learned another company had offered to hire him at a higher salary. [Carle depo., pp. 82, 97, 101-103]

[19]Mr. Hidalgo denies ever breaking any of plaintiff's work. [Hidalgo depo., p.24] Mr. DesOrmeaux denies ever hearing of this incident. [DesOrmeaux depo., pp. 53-54]

[20]Defendant notes this opinion is based entirely on plaintiff's subjective belief.

[21]As defendant notes:

> Significantly, in deposition testimony, Carle explained that the 'straw that broke the camel's back,' leading to her last-day meeting with Stakes and Romero was a conflict she had with plumber John Nguyen over the location for installation of a vacuum hose. The plumber was to install the hose in Carle's work area and she objected. The non-

- The Maurice facility where plaintiff worked employed only two other females, who were cleaning ladies "doing the menial little things." [Id. at 160]

- Plaintiff states Mr. Hidalgo was "a little coward" with regard to the other male employees; plaintiff "was the only one he would treat that way." [Id. at 172]

- On some uncertain date, plaintiff asked for time off to visit her sister who had been diagnosed with cancer. Randy Romero told her she would have to wait until they had completed the job they were working on. However, according to plaintiff, Mr. Hidalgo "asked off to get ready for his wedding, and he got every day off he wanted off." [Id. at 190]

- A carpenter named "Devon" "went around calling me a broad all the time, which I didn't appreciate." [Id. at 194]

- "[T]hey put Luke in charge of the cabinet shop when Keith was gone, and I'd been there a whole year before Luke. . . ." [Id. at 195-96]

- Plaintiff was given "the nastiest part of the work, and then they'd go to something new and I was stuck with just cleaning up after them." [Id. at 201-02]

- At some point during plaintiff's employment, Pat Schexnayder said the company "had gone to pot since they hired women." [Id. at 232-33][22]

Turning to the factors the Court must evaluate to determine whether a reasonable employee would have felt compelled to resign under plaintiff's circumstances, the Court first notes plaintiff does not contend she was demoted, that her salary was reduced, nor that she was offered early retirement. *See* factors (1), (2) and (6) in Aryain at 451. Plaintiff does not argue her job

---

supervisor co-employee disregarded her position on the matter. "They were ignoring me, so I quit," said Carle. [Carle depo. pp 154-55, 170, Ex. A] The incident which provoked Carle's decision to leave her employment with LQT was totally unrelated to Keith Hidalgo, Pat Schexnayder, Shea Stakes or her supervisor Randy Romero. It was an ordinary workplace disagreement with another employee about a matter unrelated to Carle's gender, or any other protected status claimed by Plaintiff. It was not sexually offensive, nor does Carle describe it to be so. It was not reported by Carle in the meeting with Stakes and Romero.

[Rec. Doc. 11, pp. 18-19]

[22]Defendant notes this incident was never reported to plaintiff's supervisors. [Rec. Doc. 11, p. 14]

responsibilities were reduced, or that she was reassigned to menial or degrading work. Id. (factors (3) and (4)).[23] While plaintiff does allege she was badgered, harassed and/or humiliated, Id. (factor (5)), the Court has found those incidents are insufficient to rise to the jurisprudentially required level of a hostile work environment, and thus, they are also insufficient to rise to the level required for a successful claim of constructive discharge Brown, *supra* ("Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim. Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge . . . .") Finally, plaintiff has not alleged she was offered "early retirement on terms that would make the employee worse off whether the offer was accepted or not." Aryain at 481 (factor 6). In sum, plaintiff has not shown that "a reasonable employee in her position would have felt compelled to resign." Id.

Like the plaintiff in Aryain, Ms. Carle "never raised any complaint about the negative treatment she supposedly endured. . . ." Aryain at 481. Additionally, Ms. Carle gave LQT "no opportunity to improve her situation. . . ." Id. However, "In the constructive discharge context, we have recognized that 'part of an employees obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast.'" Aryain at 482 (quoting Dornhecker at 310). As in Aryain, in this matter plaintiff's "testimony indicates she assumed the worst and made no effort to allow . . . [her employer] the opportunity to remedy the problem she identified. While . . . [plaintiff] may have subjectively felt that resignation was the only viable option, her working conditions at . . . [LQT] would not compel a reasonable employee to resign." Id. at 42. Due to the foregoing, plaintiff's constructive discharge claim is DENIED.

---

[23]Rather, plaintiff argues she was never provided the same responsibilities as her male counterparts and was only given "little piddley things to do." However, the Court finds plaintiff's job assignments were a necessary part of carpentry and were neither "menial" nor "degrading."

### 3. **Intentional Infliction of Emotional Distress**

Under Louisiana law, to recover damages for a claim of intentional infliction of emotional distress, a plaintiff must establish: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." White v. Monsanto, 585 So.2d 1205, 1209 (La. 1991). As stated in Nicholas v. Allstate Ins. Co., 765 So.2d 1017, 1022 (La. 2000):

> It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim, "Outrageous!"

Id.; *accord* McCoy v. City of Shreveport, 492 F.3d 551, 563 (5th Cir. 2007). Finally, "disciplinary action and conflict in a pressure-packed workplace environment, though calculated to cause some degree of mental anguish, are not ordinarily actionable." White at 1210.

In support of its motion for summary judgment, defendant points to an absence of evidence to support plaintiff's claim for intentional infliction of emotional distress. Thus, the burden shifts to plaintiff to demonstrate, by *competent* summary judgment proof, that there is an issue of material fact warranting trial. Lindsey at 618. Plaintiff has attempted to carry this burden by offering nothing more than the following statement: "Again, all of the evidence presented above shows that plaintiff can prove her claim of intentional infliction of emotional distress and therefore defendant's Partial Motion for Summary Judgment should be denied." [Rec. Doc. 15, p.25] This statement is

insufficient to carry plaintiff's *prima facie* burden, as plaintiff has failed to present any evidence establishing or pointing to any genuine issue of material fact as to the elements set forth in White. *See also* Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir.1994)("But, although they submitted two volumes of evidentiary material, they did not identify the specific portions of such evidence (if any) that supported their illegal interception claim. The appellants' response and supporting evidence are insufficient to preclude summary judgment. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.' Skotak [v. Tenneco Resins, Inc.], 953 F.2d [909] at 915 & n. 7 [(5th Cir. 1992)]; Solo Serve Co. v. Westowner Association, 929 F.2d 160 (5th Cir. 1991)(Party opposing Motion for Summary Judgment must present "evidence - not argument, not facts in the Complaint" to demonstrate the existence of a genuine issue of material fact.). Moreover, for the reasons previously noted, and based upon the evidence presented within this motion, the Court finds defendant's conduct was not "extreme and outrageous," and additionally finds plaintiff has offered no evidence that she suffered any kind of "severe emotional distress." White, *supra*. Accordingly, plaintiff's claim for intentional infliction of emotional distress is DENIED.

## IV. CONCLUSION

For the foregoing reasons, the Motion for Partial Summary Judgment [Doc. 11] filed on behalf of Maritime Housing Inc. d/b/a Living Quarter Technology is GRANTED in its entirety.[24]

Lafayette, Louisiana, this 27 day of _____, 2009.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

[24]Thus, the only remaining claim is plaintiff's F.L.S.A. claim for overtime compensation.